1                   UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3

4      UNITES STATES OF AMERICA            )
                                           )
5                                          )
       vs.                                 )
6                                          )  1:16-cr-10289-DPW
                                           )
7      KYLE P. NATHAN,                     )
                                           )
8                        Defendant.        )

9

10     BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK

11

12                        SENTENCING HEARING

13

14

15           John Joseph Moakley United States Courthouse
                         Courtroom No. 1
16                       One Courthouse Way
                         Boston, MA 02210
17                   Wednesday, July 12, 2017
                            3:30 p.m.
18

19

20
                    Brenda K. Hancock, RMR, CRR
21                     Official Court Reporter
             John Joseph Moakley United States Courthouse
22                       One Courthouse Way
                         Boston, MA 02210
23                        (617)439-3214

24

25

```
 1    APPEARANCES:

 2

 3           UNITED STATES ATTORNEY'S OFFICE MA
             By: AUSA Kenneth G. Shine
             1 Courthouse Way
 4           Suite 9200
             Boston, MA 02210
 5

 6           FEDERAL PUBLIC DEFENDER OFFICE
             By: Scott Lauer, Esq.
 7           District of Massachusetts
             51 Sleeper Street
 8           5th Floor
             Boston, MA 02210
 9           On behalf of the Defendant.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1             (The following proceedings were held in open court

2     before the Honorable Douglas P. Woodlock, United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

6     Wednesday, July 12, 2017)

7             THE CLERK:  All rise.

8         (The Honorable Court entered the courtroom at 3:30 p.m.)

9             THE CLERK:  This Honorable Court is now in session.

10    You may be seated.  Criminal Action Number 16-10289, United

11    States v. Kyle Nathan.

12            THE COURT:  Well, I have the defendant's Sentencing

13    Memorandum with attached letters, and I have the Presentence

14    Report.  Is there any other written material I should have?

15            MR. SHINE:  There's nothing from the Government, sir.

16            MR. LAUER:  Nor from the defense.

17            THE COURT:  And in reviewing the Presentence Report --

18    which I guess, Mr. Lauer, you have discussed fully with your

19    client.

20            MR. LAUER:  Yes, your Honor.

21            THE COURT:  Apart from a couple of modest matters,

22    there does not appear to be anything in dispute.  That is to

23    say, the Total Offense Level will be 23, the Criminal History

24    Category will be II, the guideline provisions would be

25    51 months' to 63 months' incarceration, supervised release of 1

1     to 3 years, a fine of $20,000 to $200,000, restitution of

2     $19,480, and Special Assessment on I guess each of the four

3     counts of $100, so a total of $400.

4            MR. LAUER:  We are in agreement with everything

5     provided in the Presentence Report, with the caveat that the

6     final restitution amount may differ slightly, and that's

7     something that Mr. Shine and I are in consultation about.

8            MR. SHINE:  It appears that one of the banks a lot of

9     money was recovered.  It was dye-stained.  So, what I thought I

10    would ask you to do is withhold any judgment on restitution,

11    two weeks and I will confirm that, and we will file a joint

12    memo, agreed joint memo, with the restitution number for the

13    Court.  I thought that would be fair.

14           THE COURT:  All right.  Fine.

15           MR. LAUER:  And that's agreeable.

16           THE COURT:  All right.  So, Mr. Shine, let me hear

17    from you about the Government's recommendation.

18           MR. SHINE:  Your Honor, this started as a very

19    troubling case, but I think it is going to have a reasonable

20    resolution.

21           In 2015 to 2016 a series of banks in the Greater

22    Boston Area were robbed, 10, 12, maybe even up to 14 banks.  At

23    this point the FBI had identified, they felt, two individuals

24    who might be involved in the robbery.  One is a gentleman by

25    the name of James Sarno, who is significantly older than the

1   other individual, who is the defendant here before you,

2   Mr. Kyle Nathan.  So, there were bits and pieces, nothing

3   concrete on all of them, just small bits and pieces around, but

4   we felt they were all done the same way, the manner and method,

5   presence of a car, there were never any bombs, there were never

6   any weapons showed, they were all note jobs.  So, we pretty

7   much included that these individuals were involved in the

8   robberies, and the majority of those being the other

9   individual.  We thought that maybe Mr. Nathan was in concert

10  with him, but we had no concrete proof.

11          However, then on March 18th of 2016 a Citizens Bank,

12  which is contained within a Stop & Shop Supermarket in

13  Chelmsford, was robbed by this gentleman, Mr. Nathan.  He was

14  arrested a very short period of time later.  Mr. Sarno, who had

15  not entered the bank, was arrested at a remote location at a

16  different time.

17          We provided initial discovery on this case, and

18  Mr. Lauer and myself spoke about the other cases, and I

19  provided him what I felt would be the best evidence I would

20  have on the other robberies.  Mr. Nathan came to the table

21  almost immediately and indicated a willingness to resolve those

22  open matters.

23          As to the other robberies, we were ready to charge

24  Mr. Sarno.  He, however, stayed in state court and pled guilty

25  and received a sentence.  I think there were ten banks he ended

1    up being charged with in the state court and received a

2    sentence of 7 to 10 years' imprisonment.  He had a different

3    record, and the Government felt that was a reasonable

4    resolution of his end of the matter, and so we chose not to

5    charge him and just have Mr. Nathan here.

6           Mr. Nathan does not have an extensive record, but the

7    record clearly shows a problem, continuing problem, with drugs

8    and, in particular, I believe heroin, which caused a lot of

9    this situation.

10           He has prior convictions for possession of heroin and

11    some other arrests for heroin, so he has had some criminal

12    history.  His criminal history is not that great, but I wanted

13    to give you a framework of why the Government even started

14    looking at this, and then Mr. Nathan came.  As a result of

15    that, the Government believes that the *Guidelines* are

16    appropriate in this matter, and, as I indicated during any

17    negotiations, that I would be recommending the low end of the

18    *Guidelines* as found.

19           So, I think a period of 51 months' imprisonment is an

20    appropriate number.  It is a little over 4 years.  With credit

21    for time served, he will probably be out in 3 years and some

22    change.  I would also ask for a period of 3 years of supervised

23    release.

24           This is not the same man I looked at when I arraigned

25    him last year about this time.  He has improved his health, he

1    looks great, and I understand through Mr. Lauer that he's been

2    really doing well and going in the right direction.

3            THE COURT:  What do I do about Paragraph 4 of the

4    Presentence Report, which reports records of disciplinary

5    actions, disciplinary reports, numerous disciplinary reports

6    for actions such as use of obscene, abusive and insolent manner

7    or language or gesture, conduct which disrupts the normal

8    operation of the facility or unit, refusing a direct order by

9    staff, and making or introducing or transferring intoxicants?

10   And he has received apparently some punishments, including loss

11   of telephone and loss of canteen.

12           MR. SHINE:  Yes, it cannot be overlooked.  I think

13   that was the Kyle Nathan that walked into prison a year ago

14   still with the taste for drugs and still with the attitude, and

15   he had that attitude, and I think that's changed.  I have not

16   been able to update if there is anything new.  I imagine if

17   there was there would be something happening.

18           In my opinion, this is not the same guy that walked

19   in.  Paragraph 4 was the guy that we arrested and charged.

20   This is not the same guy.  That's why I think the sentence is

21   reasonable.  I also want a period of 3 years of supervised

22   release and for him to be asked and to be made available for

23   different programs.  We could provide him with R.I.S.E. and

24   then the Restart Program when he gets out to, you know, give

25   him a soft landing place.  The expectation is when he gets out

1    I will still be here and you will still be here, and I don't

2    want to see him again, and I think if we set -- structure this

3    in such a way, we can prevent that from happening.

4         So, I think 51 months is the low end of the advisory

5    guidelines, a period of supervised release for 3 years.  The

6    restitution, it's going to be 17- to $19,000, give or take.

7    That will be determined within two weeks.  The mandatory

8    Special Assessment is $400, which has to be paid.  He has no

9    assets that I'm aware of.  The pretrial did not have any

10   assets, so that no fine would be appropriate.  And then

11   forfeiture as stated in the Indictment.  I think there's just

12   some minor -- some clothing and things along those lines.

13        I think that's a fair number.  I think this young man

14   is going in the right direction, and I'm happy to make the

15   recommendation.  Thank you.

16        THE COURT:  All right.  Let me just ask Probation,

17   with respect to the disciplinary proceedings in Cedar Junction,

18   what is the date?

19        THE PROBATION OFFICER:  Your Honor, I'm actually

20   flipping through those disciplinary reports right now and just

21   trying to get a general range of the dates of offenses.  I

22   believe I'm looking at one here from November of 2016, February

23   of 2017, October of 2016, October of 2016.  From what I can see

24   here, it runs from approximately October of 2016 to

25   approximately February of 2017, just looking quickly.

1          THE COURT:  These are at the time that he has first

2    been incarcerated?

3          THE PROBATION OFFICER:  I believe he was incarcerated

4    originally in March of 2016, so it would have been

5    approximately seven months after the arrest.

6          THE COURT:  Okay.  Anything in 2017?

7          THE PROBATION OFFICER:  I believe the latest or the

8    most recent --

9          MR. SHINE:  February.

10          THE PROBATION OFFICER:  -- that I can see would be

11    February of 2017.

12          THE COURT:  What was it?

13          THE PROBATION OFFICER:  I would have to look.

14          MR. SHINE:  I guess, while we are going through it, he

15    was arrested on my matter in August of '16, and then he was --

16          THE COURT:  But he was in state custody at that point?

17          MR. SHINE:  Yes.  And then, when he was sent over,

18    which would have been, he wasn't indicted until October, so

19    those offenses, not all of them, there was one, to be perfectly

20    candid on that, but the majority of those offenses occurred

21    within I'd say a month or so of the Indictment coming down.

22    And then the Superseding Information wasn't filed until earlier

23    this year, but negotiation was ongoing.  And I will be very

24    candid, it wasn't he was dragging his feet.  It was just

25    getting everything together.  He expressed a willingness to

1    resolve the cases.

2              THE COURT:  As to the 2017, February 2017 matter?

3              THE PROBATION OFFICER:  Yes, your Honor.  In regards

4    to the February 10th, 2017 offense there are three offenses --

5    excuse me -- multiple offenses listed:  Refusing a direct order

6    by any staff member, attempting to commit any of the above

7    offenses --

8              THE COURT:  I'm sorry.  I'm not hearing you, so maybe

9    if you can speak into the --

10             THE PROBATION OFFICER:  Sorry, your Honor.

11   Absolutely.

12             The offenses noted for the February 10th, 2017 report

13   note:  Offense One, refusing a direct order by any staff

14   member; two, attempting to commit any of the above offenses,

15   making plans to commit any of the above offenses, or aiding

16   another person to commit any of the above offenses shall be

17   considered the same as the commission of the offense above.

18             THE COURT:  I can't see what is above.

19             THE PROBATION OFFICER:  It's refusing a direct order

20   by any staff members, the one noted above it.

21             The third violation, he was violating any department

22   rule or regulation or any other rule, regulation or condition

23   of an institution or community-based program; Offense Number

24   Four listed as failure to comply with standing count

25   procedures; and Offense Number Five listed is attempting to

1    commit any of the above offenses.  It's a duplicate of the

2    second offense.

3         THE COURT:  What is the underlying nature of this,

4    refusing a count?

5         THE PROBATION OFFICER:  The quick description of the

6    offense is, "On February 10th at approximately 22:00 hours this

7    correction officer was conducting a major count in Block 4

8    Housing Unit.  At that time inmate Kyle Nathan" -- excuse me --

9    "Nathan, Kyle refused to stand for count.  Inmate laid down on

10   his bed, refusing to stand, and only lifted his head and said,

11   'I just did.'  I continued on with my count.  All appropriate

12   authorities were notified, and then Nathan was placed on

13   Double A status."  That was the brief stipulation of the

14   offense.

15        THE COURT:  All right.  Okay.  Mr. Lauer.

16        MR. LAUER:  I can probably begin by stating the

17   obvious, that the driving factor in the conduct before the

18   Court is substance abuse, and for someone of his age I think,

19   at least in my experience, the extent and the entrenched nature

20   of his drug problem is very concerning.  It is detailed in the

21   PSR, but in many ways it is a cautionary tale.

22        Mr. Nathan is someone who came from a solid

23   background.  He was well provided for in his childhood.  There

24   were some things that happened that were not the easiest to

25   deal with, but he had caring parents.  He still has carrying

1    parents.  He has family members, friends, people who are

2    supportive figures in his life, many of whom are here today

3    seated in the gallery.  And what is described in the

4    Presentence Report and what is described in the letters that

5    were submitted is someone who drifted away in many ways,

6    someone whose drug abuse began at a young age, perhaps as

7    experimentation or dabbling, grew steadily worse, and at the

8    time of the commission of these offenses was really beyond his

9    ability to control.  This is a gentleman who was essentially

10   homeless, desperate, going from high to high and burning

11   through massive amounts of drugs, particularly heroin and

12   opiates.

13        And so, I think in some ways what we see manifested

14   here is really some of the worst fears about where drug abuse

15   can take a person.  Mr. Nathan is not here to make excuses for

16   himself.  He made the choices to put those substances in his

17   body, and he is going to have to live with the consequences of

18   those choices.

19        But what I can tell the Court and put in some context

20   is that this is a person who does have a number of positive

21   things in his life, and he will have those positive things in

22   his life at the conclusion of whatever sentence the Court

23   imposes.  He has the benefit of a high school education, he has

24   the benefit of work experience, and he managed to do those

25   things even while in the midst of a very serious drug problem.

1          When he is released he intends to avail himself of

2     whatever drug treatment he can.  I should mention for the Court

3     that, while Mr. Nathan's drug problem was raging, he on a

4     number of occasions did take steps to try and address it on his

5     own.  He checked himself into rehab I think five times and had

6     difficulty making the next step into a longer-term treatment

7     facility.  Some of that was due to his own choices, but some of

8     that was also due to the limitations having to do with his

9     family's financial situation and their insurance.

10         So, Mr. Nathan is 24 years old.  He will be 25 in two

11    weeks.  He has been in custody for 17 months.  He needs drug

12    treatment.  That is the single-most overriding factor in

13    whether he will recidivate or not.  We are asking the Court to

14    make a judicial recommendation that he be permitted to

15    participate in the Residential Drug Abuse Program.

16         THE COURT:  Well, your recommendation is essentially

17    for 19 more months of incarceration.  If I were to make the

18    recommendation to the Bureau of Prisons it would not be -- it's

19    always a recommendation, but it would not be at the top of the

20    list, I guess, at least as I understand what the Bureau of

21    Prisons does with the Residential Drug Treatment Program.  They

22    want a longer period of time in prison, in part because one of

23    the benefits, collateral benefits, but benefits of the

24    Residential Drug Treatment Program is earlier release.  Not

25    that I would send somebody away to prison so that they get drug

1   treatment, that is not the purpose of prison, but it is a

2   recognition of what the prison has to offer here or what is

3   available to a defendant here, and so there is a kind of

4   Catch 22, I guess, in the recommendation.

5          MR. LAUER:  Well, what I can tell the Court, I don't

6   know that there's any way to predict with certainty what will

7   happen to him in BOP.  His history strongly suggests that he

8   would benefit from that program.

9          THE COURT:  Yes.

10         MR. LAUER:  He intends to avail himself of that

11  program, if afforded the opportunity to do so.  But regardless

12  of for administrative reasons or whatever reasons, if that is

13  not feasible, it is certainly feasible for him to be placed on

14  very strict supervision and very strict monitoring once he is

15  placed on supervised release.  And I think the Court would be

16  appropriately considering what conditions might accomplish

17  that, once he is placed on supervised release.

18         We are proposing that Mr. Nathan be placed on

19  supervised release, that he be subjected to drug treatment and

20  monitoring, and that he pursue, if it's determined that he is

21  an appropriate candidate, the C.A.R.E. Program.  I think all of

22  those things are appropriately raised by his history.

23         I would join in Mr. Shine's characterization of

24  Mr. Nathan's appearance being markedly different today than it

25  was one year ago.  I understand the Court's concern with

1    respect to Paragraph 4.  He is at MCI-Walpole.  Unlike many

2    other detainees, MCI-Walpole is a Maximum Security State

3    Prison.  It is not an easy environment.  And on more than one

4    occasion when I have attempted to visit Mr. Nathan, I have been

5    unable to do so because the facility has been completely shut

6    down due to some sort of security incident.

7            THE COURT:  What is the reason he is in Cedar

8    Junction?

9            MR. LAUER:  That was a determination made by the

10   Marshal's Office.  I don't know why.

11           THE COURT:  Right.  But, generally, it is an adjacency

12   or association kind of issue.

13           MR. SHINE:  There is no rhyme or reason to it.

14           THE COURT:  It is just it had available beds for

15   someone who --

16           MR. SHINE:  They had available beds, and they would

17   send them there.  He was 23 years old being sent to MCI.  We

18   would have anticipated he would have been at Wyatt or at -- but

19   then remember, too, about six months or a year ago there was a

20   shuffling of the deck with Wyatt and Plymouth.

21           THE COURT:  All right.  Okay.

22           MR. SHINE:  I don't mean to interrupt, but there were

23   no reasons he had to go there, there were no specific violent

24   reasons or record reasons, because he had a minor record.

25   There was nothing he was going to do there other than --

1          THE COURT:  Or associational reasons?

2          MR. SHINE:  No, nothing like that at all.  And the

3    other individual was, actually, he was sent to State Prison, so

4    he would have ended up at MCI, the potential co-defendant would

5    have ended up at MCI himself, but he was being held in

6    Middleton while his cases were pending.

7          MR. LAUER:  So, I would just ask the Court to take

8    into consideration the environment that he was in and the fact

9    that it seems as if many of the disciplinary reports that were

10   generated occurred earlier in his period of incarceration, as

11   opposed to recently, and on the scale of punishment that

12   inmates can expect to receive the loss of telephone and loss of

13   canteen are of the more benign nature as opposed to others.

14          But the defendant who sits before you today is not the

15   defendant who walked into court approximately one year ago.  He

16   has been trying to use his time productively.  He physically

17   appears different, he mentally is, frankly, more coherent, and

18   I think that's something that a number of his family members

19   and friends have noted in their own dealings with him.  I think

20   he has come to terms with the fact that there is a consequence

21   that is going to be meted out, but he is a young man, and he

22   intends to avail himself of whatever resources he can to make

23   sure that he does not find himself before this Court again.

24          THE COURT:  All right.  Thank you.

25          Mr. Nathan, I will hear from you, if there is

1    something that you would like to say.

2           THE DEFENDANT:  Thank you for allowing me to address

3    the Court.

4           My addiction has played a major role in my decisions

5    leading up to the present situation.  I am grateful to still be

6    alive and would like to take this opportunity to thank those

7    who have supported me through all difficult times.  My family

8    has suffered tremendously as a result of my behavior.

9           I stand here ready to accept full responsibility for

10   my mistakes and start my life over again with a new perspective

11   and the wisdom of my past experience to lead me down the path

12   of success.  I am eager to prove to everyone here that I will

13   not be another statistic, that I can be a productive member of

14   society, that I will not let the skeletons of my past dictate

15   my future.

16          My sincere apologies to all whom prosecuted,

17   investigated and were inconvenienced by my crimes, especially

18   the victims I have hurt by my actions.

19          I would like to thank everyone for their time today.

20   Thank you.

21          THE COURT:  Mr. Nathan, you don't have to answer this,

22   and your counsel may counsel in a particular way, but I focused

23   on these violations.  Mr. Shine was very candid in saying the

24   bulk of them were in October, right around the time you were

25   formally charged here, effectively charged here, and then there

1    was the one in February.  What was going on?

2              MR. LAUER:  Can I have a moment, your Honor?

3              THE COURT:  Sure.

4         (Atty. Lauer conferred with the defendant off the record)

5              THE DEFENDANT:  Honestly, your Honor, just a tough

6    place to be, and I had to do this all on my own.  So, you know,

7    I'm trying to stay, like, sober best I can and, you know, I was

8    doing a lot of drugs, so my mind -- it took me a long period of

9    time to get my mind back on track, you know.

10             THE COURT:  So, let's take February.  That is ten

11   months after you started custody.  How come you got into a

12   hassle then?  What was it?  I asked and I heard that it was a

13   count problem but that you were a little bit of a smarty pants.

14             THE DEFENDANT:  The prison system also -- I could have

15   stood for count.  Honestly, your Honor, I don't remember the

16   incident, or else I would accept responsibility, but I could

17   have stand for count, and it could be just that the CO does not

18   like me, you know, to be honest.  But if that's what it says,

19   then I must have not stood for count, and I guess I accept

20   responsibility for that.

21             THE COURT:  You understand that in these

22   circumstances, that is, facing not just further incarceration

23   but also supervised release, that you cannot be willful, let's

24   put it that way.  Things that other people might view as being

25   hassled are things that you have to accept.  There is a reason

1    for it.  The reason is to provide a structured way of

2    addressing your problems, even if it seems like a hassle or

3    getting a rough time from a CO who doesn't like you.  That is

4    where you are.  You understand?

5            THE DEFENDANT:  I'm learning every day something new,

6    that there's consequences to all of my actions, like that day I

7    never thought that it would come up now in court.  I probably

8    would have thought otherwise if I understood that.

9            THE COURT:  Well, it did and it will if you find

10   yourself on supervised release.  It is not to say the Probation

11   Office does the same thing, they do not, but things that may be

12   viewed by other people as being kind of, "Why are they making a

13   big deal about a count," or something like that are important

14   for purposes of supervised release to make sure that somebody

15   is paying attention to rules and trying to comply with them,

16   even if they are minor rules or technical rules.

17           And that is why I asked the question, because you are

18   going to have to deal with that in the future.

19           THE DEFENDANT:  For what it's worth, I'm trying to

20   stay out of trouble now and I'm just trying to stay positive

21   through this whole thing, and it hasn't been an easy road the

22   past 16 months being in prison, coming off all that drugs with

23   no medication and no help whatsoever.  I had to do it all on my

24   own.  I'm learning as I go, I guess I would say, you know, I'm

25   figuring things out trial and error.  I feel like I have my

1    head back on straight, and I'm trying to stay out of trouble,

2    even in prison.

3              THE COURT:  All right.  Thank you.

4              THE DEFENDANT:  Thank you.

5              THE COURT:  So, the issues are these, it seems to me:

6    We have a set of *Guidelines*.  The *Guidelines* in this area

7    actually are at least empirically better, I think, than in

8    other areas, empirically in the sense that this kind of crime

9    has generated a fairly consistent kind of approach by judges.

10   It is, to address the considerations of Section 3553, a serious

11   offense.  Bank robbery at one time was the serious offense in

12   the Federal Courts.  There are other offenses now that have

13   taken center stage, but it used to be the meat and potatoes of

14   violent crime or core crime in the Federal Courts.

15             Now, this is different.  It is not, as Mr. Shine

16   pointed out, a case involving the threat of violence, unless

17   you could say implicit in offering a note is a threat of

18   violence, but it is a serious matter, and it is one that I

19   think bears some emphasis.  Who is the victim here?  Well, of

20   course, the banking system.  But something more.  The people

21   you give that note to, without using stereotypes, are generally

22   young women who are in their first job and are scared to death

23   when that happens and live afterwards with a sense of fear.

24   That is something that the Courts have generally taken into

25   consideration, and I do as well.

1        Now, I don't have any victims before me here, but I
2   have a template, and the template is this: that you were going
3   into a setting where there were vulnerable victims in the
4   larger sense, people at the beginning of their work life who
5   one would suspect, even in the absence of a gun or a threat, a
6   direct threat, would feel that their life has just been moved
7   in a horrible direction.  So, it is a serious offense.
8        Then I look at the nature and characteristics of you
9   as an offender.  We have all talked about your drug problem.
10  You recognize it.  You are to be credited for saying that you
11  have tried to deal with it yourself, because ultimately
12  whatever programs we have depend on whether or not you can do
13  it.  I don't have to give you the Twelve-Step Program, except
14  to say what they always say in the Twelve-Step Program:  you
15  wake up every morning and you are still an addict.  Every day
16  you have to deal with that.  But it sounds to me that you are.
17       I read these letters from people who know you, and
18  they were candid letters, I thought, recognizing your
19  shortcomings but also your possibilities.  Those are things
20  that should be credited as well in sentencing.  That is what
21  Section 3553 does.
22       I then look at the question of individual deterrence.
23  What that means is what do we need to keep you from doing this
24  again?  The overarching principle of sentencing is that the
25  sentence should be sufficient but no more than necessary to

1    serve the larger purposes of the considerations under

2    Section 3553, which I have talked about, the seriousness of the

3    offense, the idea of vindicating a public right to be free from

4    that kind of offense, dealing with you as an individual or

5    recognizing your background, but the question of individual

6    deterrence is an important one.

7           I am of the view, but this is a bet, it is not a

8    certainty, I am of the view that this is not something you are

9    going to get yourself involved in again immediately or at all,

10   but there is that potential.

11          But then I look at it from a broader perspective, that

12   is, general deterrence, the other Kyle Nathans out there who

13   find themselves slipping into and captured by drugs.  What does

14   it say to them if a sentence is at one end or the other?  It is

15   possible to over-deter, it is possible to say it will not be

16   much of a problem if people understand that you get 20 years

17   for doing something like that.  That is not what I am intending

18   to do.  On the other hand, that has to say to them there are

19   serious consequences for this kind of activity, whether or not

20   you are in the grips of demons like drugs or not.  So, that's

21   another factor.  I know what the going rate is or have seen the

22   going rate over an extended period of time for bank robbery

23   like this, and it is a heavier sentence than ordinarily you

24   would see in encounters like the encounters you had.

25          Then I look at the question of what does prison do?  I

1    asked in my discussion with Mr. Lauer what does that mean for a

2    Residential Drug Treatment Program.  Again, I am not sending

3    you to prison or would not send you to prison to give you a

4    drug treatment program that generally is pretty effective, the

5    Residential Drug Treatment Program.  On the other hand, I am

6    thinking about it, thinking about it in the sense of this is

7    part of the mix of what the proper sentence should be.  If I

8    thought that prison would be absolutely deleterious, bad for

9    you, I would think about it differently, I suppose.  But prison

10   is not a good thing, and being in Cedar Junction is no walk in

11   the park.  The Federal Bureau of Prisons has a somewhat

12   different range of alternatives.  So, I have thought about that

13   a bit.  I do think that the Residential Drug Treatment Program

14   would be useful for you.

15          And then I come to the bottom line.  It is why we have

16   *Sentencing Guidelines*.  I don't follow them slavishly.  But the

17   reason that we have *Sentencing Guidelines* is that there is a

18   danger of unwarranted disparity; that is, that somebody walks

19   into or is brought into one judge's court and gets a sentence,

20   let's say it's very low, let's say it's 18 months, and then

21   goes into the next courtroom, or someone very much like him

22   goes into the next courtroom and they get a sentence of

23   87 months.  It is corrosive to the criminal justice system to

24   have something like that, the idea that there is an

25   arbitrariness or caprice in the imposition of sentences.  And

1    so, the *Guidelines* were established as a way of trying to

2    reduce that unwarranted disparity.

3           I started with the proposition that these *Guidelines*,

4    that is, the *Guidelines* for bank robbery like this, seem to me

5    to be pretty well grounded in terms of what judges have done in

6    the last 50 years in these kinds of cases, and so I have to

7    consider that.

8           Now, I have talked about all of those separate

9    considerations as if they had a common theme.  They do in the

10   sense that you have to consider them, but they pull in

11   different ways.  If I am right in my guess that you do not have

12   to spend too much more time in prison to keep you from doing

13   this, that is, we do not have to warehouse you, that pulls in

14   one direction.  If, on the other hand, we say, well, there are

15   ranges of sentence that would not be disparate, that in this

16   case falls in a different way.  So, I have to balance all of

17   those -- "balance" is the wrong word -- accommodate them,

18   because they cannot be balanced.

19          My own view is that this is a serious offense.  You

20   have a responsibility for that serious offense.  A serious

21   sentence, incarcerative sentence, is necessary.  It is also my

22   view that it does not have to be as long as the guideline

23   provides.

24          So, I am going to impose a sentence of 42 months'

25   incarceration here.  That also, incidentally, coincidently,

1    provides the opportunity for the Residential Drug Treatment

2    Program, at least a greater opportunity that would be more

3    likely than you just getting pushed out of it because there are

4    people who are going to be there longer.  I will, in any event,

5    make a recommendation that you participate in whatever drug

6    treatment programs are available in the prison system.

7         More than that, I am going to recommend that you take

8    advantage of the opportunities that the prison system has for

9    educational and vocational training.  It is the case that you

10   worked and could work.  It is the case that you have got innate

11   intelligence.  You have got to take advantage of those kinds of

12   things as well.  Again, this is not to provide you job training

13   or the criminal justice equivalent of junior college, but it is

14   to say there are opportunities, if you take advantage of them,

15   in the prison system that are meaningful for you.

16        I cannot, in fairness, I think, impose a sentence

17   lower than that, and I'm sorry that I don't think I can,

18   because it seems to me that the report that Mr. Shine makes,

19   that Mr. Lauer makes, that you yourself make about your ability

20   to take control of your life after a life that was in some ways

21   out of your control because of your drug addiction is something

22   to be honored and valued, and I do here, but you are going to

23   have to keep doing it.

24        Now, I am not going to impose a sentence that involves

25   some kind of financial responsibility, except for the

1    restitution, and we will get to that, and the parties will

2    provide me with that.  You took money, and it wasn't yours, it

3    belongs to somebody else, and you have got to give it back.

4           There is a Special Assessment.  It comes to $400.  It

5    will be paid according to a prison-responsibility program as

6    well.

7           But the more meaningful thing for me -- and I have to

8    do this for society, that is to say, society has a claim on you

9    because you did something to society, and that is vindicated

10   through the sentence itself -- but what is important to me is

11   rehabilitation; that is, you get out, you get a job, you keep

12   clean, and you become a productive member of society.  The

13   people who have spent a lot of time supporting you and continue

14   to believe in you would feel their efforts had been validated.

15   We are all better off if you are a productive member of

16   society.  We are all not so well off if you are not.  But the

17   person who is really not well off is you.  So, we are trying to

18   get you to function in a way that would serve society by

19   serving yourself.  That means, as far as I am concerned,

20   3 years of supervised release.

21          I talked about, made a comparison between, supervised

22   release and being in prison.  It is not the same thing.  The

23   Probation Office of this court is very, very capable of being

24   supportive -- it is tough love -- but being supportive of

25   people who are moving back into society, and you will find that

1    to be the case.  You should take advantage of that, take

2    advantage of what they are going to do.

3           It has been suggested to me that the C.A.R.E. Program

4    is an appropriate one.  I think that is probably right, and I

5    will make a recommendation.  But you have to be invested in it

6    as well.  It is another one of these you have got to work hard

7    at it.  You get immediate feedback if you do something wrong.

8    On the other hand, it's a program that's useful for people who

9    have had addictions like you, and so I am going to make that

10   recommendation.

11          The terms and conditions of supervised release are the

12   customary ones, they are mandatory ones, that you don't commit

13   another federal, state or local crime, that you not possess any

14   controlled substance, that you refrain from any unlawful use of

15   a controlled substance, and in your case I am going to require

16   that there be drug testing, as many as 104 drug tests per year,

17   as probation sees necessary.  It is necessary for you to

18   provide DNA to the Probation Office as well.

19          There are standard conditions, you will see them in

20   the Judgment and Commitment Order, and you are, no doubt,

21   familiar with them as well, but I will make special conditions

22   that have to do with your situation.  First, you are prohibited

23   from drinking alcohol to the point of intoxication.  I will

24   define that the way Massachusetts does, which is a .10 blood

25   alcohol level.  I am not saying no alcohol, but I am saying you

1    can't be drunk and you can't really at .10 be too high.  You

2    have to submit to substance abuse -- I say "submit" --

3    "participate" is a better word -- in substance abuse programs

4    that are developed by the Probation Office.  That is part of

5    the drug-testing process.  It is an effort to get you into a

6    setting in which you understand the seriousness of what you are

7    doing and are getting support, maybe support by other people,

8    dealing with other people, trying to help other people who have

9    had the problems that you have.

10          I am going to permit the Probation Office also to

11   consider cognitive behavioral treatment programs more broadly

12   to deal with this.  All of this is to be tailored to your

13   special circumstance at the time that you're out and during the

14   period of supervised release.

15          You are going to be required to pay the balance of

16   restitution, if you haven't paid it by then, or any financial

17   contribution according to a Court-ordered schedule, if you have

18   not paid at that time.

19          And so long as you have outstanding financial

20   obligations, you are going to be required to provide the

21   Probation Office with access to any financial information they

22   ask for, and you should understand that that information will

23   be made available to the Financial Litigation Unit of the

24   United States Attorney's Office.

25          You are prohibited from incurring any new credit

1    charges or opening additional lines of credit without the

2    approval of the Probation Office while you are subject to these

3    financial obligations.

4         And to the degree that in any of these programs there

5    is available either directly from you, that is, you have the

6    ability to contribute to it, or there is third-party payment

7    through some sort of insurance or other mechanism, you are

8    going to be required to contribute to these programs.  These

9    are not free benefits, unless you are indigent, and the idea of

10   having people contribute is to make clear you do cause costs to

11   society more generally, and you have got to contribute to it.

12        All of this is designed to reinforce and support you.

13   It works if you work at it.  It will be a shame if you do not.

14   But for all of those reasons I am imposing the sentence that I

15   have indicated.

16        Now, are there any additional points that the parties

17   or Probation would ask me to add to it?

18        MR. SHINE:  No.  We will determine for this Court, and

19   we will file a joint memorandum within two weeks, of the

20   restitution figure.

21        THE COURT:  Right, right.

22        MR. SHINE:  Other than that, everything is spot on.

23        MR. LAUER:  Nothing further.

24        THE COURT:  Anything from Probation?

25        THE PROBATION OFFICER:  Nothing.

1              THE COURT:  You should understand that in this

2     session, Mr. Nathan, you do have a right of appeal, and you

3     will want to discuss with your attorney whether that makes any

4     sense under these circumstances.  All right?

5              THE DEFENDANT:  Thank you, your Honor.

6              THE COURT:  I didn't mean to lecture you, but of

7     course I did, but it is up to you.  Everybody here is betting

8     on you.  Bet on yourself, okay?

9              THE DEFENDANT:  Okay, I will.  Thank you.

10             THE COURT:  Good luck.

11             MR. SHINE:  Thank you, your Honor.

12             THE COURT:  Thank you.

13             THE CLERK:  All rise.

14         (The Honorable Court exited the courtroom at 4:15 p.m.)

15            (WHEREUPON, the proceedings adjourned at 4:15 p.m.)

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

        I, Brenda K. Hancock, RMR, CRR and Official Court

Reporter of the United States District Court, do hereby certify

that the foregoing transcript constitutes, to the best of my

skill and ability, a true and accurate transcription of my

stenotype notes taken in the matter of *United States of America*

*v. Kyle Nathan*, No. 1:16-cr-10289-DPW

Date:   7/29/17                    /s/ *Brenda K. Hancock*
                                   Brenda K. Hancock, RMR, CRR
                                   Official Court Reporter